# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| **KAREN L.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Civil Action No. 7:18-cv-120** |
| | ) |
| **ANDREW SAUL,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## REPORT AND RECOMMENDATION

  Plaintiff Karen L. ("Karen") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Karen alleges that the Administrative Law Judge ("ALJ") erred because substantial evidence does not support (1) his evaluation of certain medical opinion evidence, and (2) his assessment of his prior unfavorable decision. I conclude that substantial evidence does not support the ALJ's consideration of his prior unfavorable decision. Accordingly, I **RECOMMEND GRANTING in part** Karen's Motion for Summary Judgment (Dkt. No. 13),[1] **DENYING** the Commissioner's Motion for Summary Judgment (Dkt. No. 15), and **REMANDING** this case for further consideration.

## STANDARD OF REVIEW

  This Court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Karen failed to demonstrate that she was disabled

---

[1] While Karen does not submit a formal motion for summary judgment, I construe her brief as requesting that relief.

under the Act.[2] <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001). This standard of review requires the Court to "look[] to an existing administrative record and ask[] whether it contains 'sufficien[t] evidence' to support the [ALJ's] factual determinations." <u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted). "The threshold for such evidentiary sufficiency is not high." <u>Biestek</u>, 139 S. Ct. at 1154. The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

However, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." <u>Mascio v. Colvin</u>, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" because the court is "left to guess [at] how the ALJ arrived at his conclusions"); <u>see also</u> <u>Monroe v. Colvin</u>, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often) (citation omitted). In <u>Mascio</u> and <u>Monroe</u>, the Court of Appeals remanded because the ALJ failed to adequately explain how he arrived at his conclusions regarding the claimant's RFC. <u>Mascio</u>, 780 F.3d at 636; <u>Monroe</u>, 826 F.3d at 189. Similarly, I find that remand is

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects her ability to perform daily activities or certain forms of work. Rather, a claimant must show that her impairments prevent her from engaging in all forms of substantial gainful employment given her age, education, and work experience. <u>See</u> 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

appropriate here because the ALJ's opinion leaves the Court to guess at how the ALJ considered his prior unfavorable decision.

**CLAIM HISTORY**

This action arises out of Karen's second application for disability benefits. ALJ Jeffrey J. Schueler issued an unfavorable decision regarding Karen's first application on September 3, 2013. R. 83. In her previous claim, the ALJ found that Karen's severe impairments included cervical spondylosis without myelopathy, cervical degenerative disc disease, cervical radiculopathy, lumbar degenerative disc disease and spondylosis, hypertension, cardiomyopathy, dyspnea, major dap-, post-traumatic stress disorder, and anxiety disorders. R. 72. The ALJ found that Karen did not have an impairment or combination of impairments that met or medically equaled a listed impairment. R. 73. In his "paragraph B" criteria evaluation, the ALJ found that Karen had mild restriction in activities of daily living; moderate difficulties in social functioning; moderate difficulties with concentration, persistence or pace; and no episodes of decompensation. Id. For his RFC determination, the ALJ found that Karen could perform sedentary work, except that she could lift and carry up to ten pounds frequently and twenty pounds occasionally, and must have been allowed to change postural positions every thirty minutes. R. 74. He determined that Karen could occasionally kneel, crawl, crouch, stoop, balance, or climb, and would have to avoid concentrated exposure to moving or hazardous machinery and unprotected heights. Id. Karen would have been off-task up to ten percent of the workday, and absent up to once per month due to mental impairments and pain. Id. Finally, Karen must have worked in a low-stress job, defined as requiring only occasional decision-making or changes in work setting, with only occasional interaction with the public or coworkers. Id. The ALJ determined that Karen was not disabled because she could perform jobs

that existed in significant numbers in the national economy, such as surveillance system monitor, product inspector, and small parts assembler. R. 82.

Karen filed her present application for DIB on September 25, 2014, with an alleged onset date of September 4, 2013 (the day following the ALJ's prior decision), claiming disability due to post traumatic stress disorder, anxiety, depression, insomnia, fibromyalgia, degenerative disc disease, arthritis, hypertension, attention deficit disorder, and irritable bowel syndrome. R. 100–01. Karen was 46 years old when she applied for DIB, making her 45 years old on her alleged onset date. R. 100. Karen's date last insured was December 31, 2016; thus, she must show that her disability began on or before December 31, 2016, and existed for twelve continuous months, to receive DIB. Id.; 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied Karen's applications at the initial and reconsideration levels of administrative review. R. 100–30. On January 19, 2017, ALJ Schueler held a hearing to consider Karen's new claim for DIB. R. 33–66. Counsel represented Karen at the hearing, which included testimony from vocational expert Robert Jackson. R. 33. On March 10, 2017, the ALJ entered his decision analyzing Karen's claims under the familiar five-step process[3] and denying her claim for benefits. R. 11–25.

The ALJ found that Karen had not engaged in substantial gainful activity during the period from her alleged onset date of September 4, 2013, through her date last insured of December 31, 2016. R. 13. The ALJ determined that Karen suffered from the severe impairments

---

[3] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to her past relevant work; and if not, (5) whether she can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

of fibromyalgia, irritable bowel syndrome (IBS)/Crohn's disease, degenerative disc disease (DDD) of the cervical spine, DDD of the lumbar spine, major depressive disorder (MDD), anxiety, post-traumatic stress disorder (PTSD), and attention deficit hyperactivity disorder (ADHD). Id. The ALJ found Karen's hypertension and cardiomyopathy to be non-severe. Id. The ALJ determined that Karen's impairments, either individually or in combination, did not meet or medically equal a listed impairment, specifically considering listings 1.04 (disorders of the spine), 5.06 (inflammatory bowel disease), 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.11 (neurodevelopmental disorders), and 12.15 (trauma- and stressor-related disorders). R. 14–15. Regarding her mental impairments, the ALJ found that the "paragraph B" criteria were not satisfied. R. 16. The ALJ determined that Karen has no limitation in understanding, remembering, or applying information; moderate limitation in interacting with others; moderate limitation in concentrating, persisting, or maintaining pace; and no limitation in adapting or managing herself. R. 15–16. The ALJ also determined that the "paragraph C" criteria were not met. R. 16.

The ALJ concluded that Karen retained the residual functional capacity ("RFC") to perform sedentary work. R. 16. Karen was able to lift and carry ten pounds frequently and twenty pounds occasionally, sit for six hours in an eight-hour day, and stand and/or walk for two hours in an eight-hour day. Id. Karen needed to be able to alternate sitting or standing at will throughout the day. Id. For postural limitations, the ALJ determined that Karen was unable to climb ladders, ropes, or scaffolds, but could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. Id. For environmental limitations, Karen had to avoid concentrated exposure to excessive vibration, operational control of moving machinery, unprotected heights, and hazardous machinery. R. 16–17. Karen was limited to work in a low-stress job (defined as

having only occasional decision-making or changes in the work setting) with only occasional interaction with the public or coworkers. R. 17. Finally, Karen would have been distracted from work activities not more than ten percent of a normal workday. Id.

The ALJ determined that Karen is unable to perform her past work as an insurance agent or payroll clerk, but could still perform jobs that exist in significant numbers in the national economy, such as inspector/grader and packer. R. 23–25. The ALJ ultimately concluded that Karen was not disabled. R. 25. The Appeals Council denied Karen's request for review on January 22, 2018. R. 1–5.

## ANALYSIS

Karen alleges that the ALJ erred because substantial evidence does not support (1) his assessment of his prior unfavorable decision, and (2) his evaluation of certain opinion evidence.

### A. Medical History

Karen has an extensive medical history, which reflects the close relationship between her separate disability applications. In this appeal, Karen primarily argues that the ALJ erred by according great weight to his prior unfavorable decision, dated September 4, 2013. Pl.'s Br. at 9, Dkt. No. 13. She specifically argues that the ALJ failed to recognize the voluminous additional medical evidence in this case, including the many new medical source statements. Id. at 10. In failing to consider that evidence, she alleges that the ALJ erred in assuming that Karen's medical conditions could not and did not deteriorate over time. Id. at 11.

1. Physical Impairments

A May 2013 cervical spine MRI showed that Karen had moderately severe narrowing of the C5-C6 disc space with edema in the disc and endplates (interpreted as possible DDD), a small posterior disc herniation with no significant spinal or foraminal stenosis, a small herniated

disc at C4-C5 with mild narrowing of foramina, and severe narrowing of the C6-C7 disc space but no significant spinal or foraminal stenosis. R. 370. An April 2015 cervical spine x-ray showed DDD. R. 740. A May 2015 cervical spine MRI revealed multilevel cervical DDD with severe narrowing at C4-C5, C5-C6, and C6-C7; moderate narrowing of foramina bilaterally at C4-C5; and mild to moderate narrowing of the right foramen at C5-C6. R. 779.

Regarding Karen's lower back issues, a June 2013 lumbar spine MRI showed minimal DDD at L5-S1, and no disc herniations, spinal stenosis, or neural foraminal stenosis. R. 380. The study showed no abnormality to account for the radiculopathy Karen alleged at that time. Id. Karen was evaluated by John Birkedal, M.D., for her neck and back pain in September 2013, during which he diagnosed degeneration of cervical intervertebral disc, cervicalgia, and degeneration of lumbar or lumbosacral intervertebral disc. R. 442, 446. He found no surgical indication. R. 446. A November 2016 lumbar spine imaging study revealed degenerative changes. R. 933. The records show that Karen attended physical therapy for her low back pain from November to December 2016, to which she responded positively. R. 957–76.

Susan Griffin, M.D., of Forest Family Care, was Karen's primary care provider from November 2013 to at least November 2016. Throughout the course of their relationship, Dr. Griffin diagnosed IBS, Crohn's, or other gastro difficulties (R. 456, 482, 913), insomnia (R. 456, 556), unspecified myalgia (R. 460, 463, 470, 474, 480, 482), degeneration of cervical disks (R. 460, 470, 480, 482, 556, 773, 781, 917), intervertebral lumbar disc disorder with myelopathy or other lumbar spine problems (R. 456, 470, 480, 547, 772, 913, 917), joint pain in Karen's arms and/or pelvis/thigh (R. 547, 549), and tremors (R. 913). She regularly prescribed and adjusted medication for Karen's conditions. Other providers at Forest Family Care, including Jill Snider, FNP, and Tammy Terry, CFNP, diagnosed gastrointestinal issues (R. 798, 868), arthralgia and

myalgia (R. 798), right shoulder pain (R. 864), and degeneration of cervical discs (R. 864, 868).

After having difficulties with abdominal pain, vomiting, and diarrhea, imaging studies in February and August 2014 of Karen's abdomen were unremarkable. R. 386, 390. In late 2014, Karen's gastroenterology specialist diagnosed abdominal pain, diarrhea, and likely IBS, and prescribed medication. R. 531. A September 2014 CT of the abdomen and a colonoscopy were unremarkable. R. 535, 544. In late 2015, Karen was again diagnosed with diarrhea and abdominal pain. R. 810. Robert Benish, M.D., evaluated Karen for her gastrointestinal difficulties in April 2016, during which he diagnosed Crohn's disease, heartburn, and diarrhea and prescribed medication. R. 875. He saw Karen through at least July 2016 and continued to diagnose Crohn's in addition to IBS, and maintained her medication. R. 878, 980, 983, 986, 999, 1003.

Karen began seeing rheumatologist Song Zang, M.D., in December 2013. Upon initial evaluation, Dr. Zang found that Karen had no swelling in her joints and normal ranges of motion, but multiple joints and muscle groups were tender to palpation. He diagnosed fibromyalgia, characterizing it as a "rather definite" diagnosis. R. 340. He started Karen on medication. Id. In May 2014, Dr. Zang reported that Karen's fibromyalgia was stable and continued her current medication. R. 337. Dr. Zang diagnosed fibromyalgia again in February 2015 and March 2016, and continued Karen's medications. R. 621, 852.

Karen completed a fatigue questionnaire in September 2014, in which she wrote that she suffers from chronic fatigue and pain. R. 252. She stays home most of the time, does not drive, and relies on others to do housework. Id. She gets only two to three hours of sleep per night even with medication and many naps, but constantly feels fatigued. R. 251. She wrote that the fatigue and pain never subside, and she is never fully rested. Id.

At the hearing, Karen testified that she has pain because of her Crohn's, and her associated diarrhea caused her to lose weight. R. 44. She has pain that never goes away because of her lumbar and cervical DDD, and uses a TENS unit. R. 45. Her fibromyalgia causes additional pain in her hips, shoulders, knees, and fingers. R. 46. She testified that she spends four to five hours per day in a recliner. Id. She takes medication for insomnia and nightmares but still does not get much sleep. R. 47. Karen takes twelve medications for her conditions. R. 48–50.

2. Mental Impairments

In January 2014, Tracey Criss, M.D., evaluated Karen's psychological condition. Karen's mental status exam was normal, and Dr. Criss prescribed medication for PTSD, MDD, and anxiety. R. 308–09.

While Karen was seeing Dr. Griffin, her primary care provider, Dr. Griffin diagnosed ADD (R. 460, 477 ), bipolar I, in remission (R. 470, 474, 553, 773), generalized anxiety disorder (R. 463), adjustment disorder with mixed anxiety and depressed mood (R. 553), and PTSD (R. 917). Other providers at Forest Family Care, including Ms. Snider and Ms. Terry, diagnosed ADD (R. 738), MDD (R. 738, 802, 868), and PTSD (R. 868).

In March 2015, Karen was admitted to St. Albans for her psychiatric condition after having suicidal ideations. Robert Dean, M.D., maintained her care at St. Albans. He diagnosed MDD (recurrent, severe), anxiety disorder, insomnia, hypertension, fibromyalgia, IBS, and an eating disorder, for which he managed Karen's medication. R. 631–92. Karen was again admitted to St. Albans for suicidal thoughts in April 2015, and Dr. Dean diagnosed an eating disorder, chronic pain, IBS, MDD (recurrent, severe, without psychotic features), PTSD, and borderline personality features, and again managed her medication. R. 694–730. Karen continued to follow up monthly with Dr. Dean through September 2015, and he continued managing her

psychotropic medication for her MDD, ADD, eating disorder, anxiety, and PTSD. R. 767, 770, 824, 826, 828. Karen saw Sandra Grazulewicz, P.A., at St. Albans from November 2015 through December 2016 after Dr. Dean retired. She diagnosed MDD, ADHD, PTSD, anxiety, nightmares, and insomnia, and continued to manage Karen's medication regimen. R. 831, 834–35, 838, 894–95, 898, 901–02, 905–06, 909–10, 1010–11.

Karen saw Ashley Ihrig, LCSW, for counseling from September 2013 through at least December 2015. Her treatment plan listed diagnoses of PTSD and anorexia. R. 592–618, 741–56, 757–64, 812–22. Karen saw Beverly Gray, LCSW, for trauma therapy from March to November 2016. R. 885–91, 946–56.

At the hearing, Karen testified that she suffers from severe PTSD after she was raped in an armed home invasion. R. 47. She has been hospitalized twice, and is on multiple psychotropic medications. R. 48. She testified that her medication makes her drowsy, and she has issues with concentration and focus. R. 51. She feels sad all the time and does not socialize. R. 52. Karen also testified to having panic attacks. R. 53.

3. Medical Opinion Evidence

In December 2014, as part of the state agency's initial disability determination, Richard Surrusco, M.D., reviewed the record and determined that Karen's severe medically determinable impairments included spine disorders, essential hypertension, anxiety disorders, affective disorders, and ADD/ADHD. R. 106. As part of his physical RFC analysis, Dr. Surrusco determined that Karen could lift or carry twenty pounds occasionally and ten pounds frequently, and stand or walk and sit each for six hours in an eight-hour workday. R. 108. She could push or pull without limitation. Id. Dr. Surrusco found no postural, manipulative, visual, communicative, or environmental limitations. Id. He concluded that Karen could perform light work. R. 111.

Howard S. Leizer, Ph.D., conducted a psychiatric review technique for the state agency. He found that Karen had mild limitation in activities of daily living; mild limitation in maintaining social functioning; moderate limitation in concentration, persistence, or pace; and no episodes of decompensation. R. 106. Dr. Leizer wrote that Karen "has difficulties concentrating and completing tasks per exams," mostly coming from "an increase on psychosocial stressors." R. 107. He observed that when "Karen is on medication, she is able to complete her daily tasks without significant difficulties." Id. For his mental RFC evaluation, Dr. Leizer found no understanding and memory limitations, but found that Karen had sustained concentration and persistence limitations. R. 109. He determined that Karen was moderately limited in her abilities to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Id. Dr. Lezier wrote that when Karen is on medication, she can complete tasks like chores, but does have some difficulties with increases in stress. Id. Dr. Leizer also found social interaction limitations. R. 109. He found that Karen was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors. Id. Dr. Leizer wrote that Karen's PTSD and depression symptoms would limit her ability to respond to criticism. R. 110. Dr. Leizer found that Karen had no adaptation limitations. Id.

As part of the reconsideration of the state agency's disability determination, Bert Spetzler, M.D., evaluated the records in February 2015. He found the same severe medically determinable impairments as Dr. Surrusco. R. 122. Dr. Spetzler made the same findings regarding Karen's exertional limitations. R. 124. He determined that she had additional postural limitations

due to her back and neck pain, fibromyalgia, and GI issues, finding that Karen could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and never climbing ladders, ropes, or scaffolds. R. 124–25. Dr. Spetzler also found no manipulative, visual, or communicative limitations. R. 125. For environmental limitations, Dr. Spetzler determined that Karen should avoid concentrated exposure to vibration and hazards. Id. Dr. Spetzler found that Karen was capable of light work. R. 129.

Jeanne Buyck, Ph.D., conducted another psychiatric review technique for the reconisderation, and found that Karen had moderate impairments in activities of daily living, social functioning, and maintaining concentration, persistence or pace. R. 122. She found no episodes of decompensation. Id. Dr. Buyck's mental RFC evaluation differed significantly from that of Dr. Leizer. She found that Karen had understanding and memory limitations in that she is moderately limited in her ability to understand and remember detailed instructions. R. 126. Dr. Buyck wrote, "Despite [Karen's] anxiety, depression, and ADHD, [Karen] should be able to understand and remember short and simple instructions." Id.

For sustained concentration and persistence limitations, Dr. Buyck found that Karen is moderately limited in her ability to carry out detailed instructions, but not significantly limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. R. 126–27. She also found that Karen was moderately limited in her ability to work in coordination with or in proximity to others without being distracted by them. R. 127. Dr. Buyck wrote, "Despite [Karen's] anxiety, depression, and ADHD, [Karen] should be able to follow 1-2 step instructions." Id.

Dr. Buyck slightly amended Dr. Leizer's social interaction limitations and found that Karen was also moderately limited in her abilities to interact appropriately with the general

public and get along with coworkers and peers without distracting them or exhibiting behavioral extremes. Id. She wrote, "Despite [Karen's] anxiety, depression, and ADHD, [Karen] should be able to work in an environment with limited contact with others." Id. Finally, unlike Dr. Leizer, Dr. Buyck found that Karen had adaptation limitations. She found that Karen was moderately limited in her ability to respond appropriately to changes in the work setting, and wrote that Karen "should be able to work in a static environment." R. 127–28. In additional comments, Dr. Buyck wrote that Karen was in medication management and counseling for depressive, anxious, and ADHD symptoms, and her mood varied depending on psychosocial stressors, but Karen had no actual decompensations, her adaptation/functioning was fairly consistent, and she "retain[ed] the ability to sustain competitive employment." R. 128.

In September 2015, Ashley Ihrig, LCSW, completed a medical source statement regarding Karen's mental ability to do work-related activities. She indicated that Karen is impaired in her ability to understand, remember, and carry out instructions. R. 788. Specifically, in the check-the-box form, Ms. Ihrig indicated that Karen had extreme limitation in her ability to perform activities within a schedule, maintain regular attendance, and be punctual. Id. She found marked limitations in Karen's abilities to (1) remember locations and work-like procedures, (2) understand and remember short and simple instructions, (3) understand and remember detailed instructions, (4) maintain attention and concentration for extended periods, (5) sustain an ordinary routine without special supervision, (6) work with or near others without being distracted by them, (7) make simple work-related decisions, (8) complete a normal workday or workweek, and (9) perform at a consistent pace. Id. Finally, Ms. Ihrig found moderate limitations in Karen's abilities to carry out short and simple and detailed instructions. Id. She described Karen's symptoms arise out of her anxiety, PTSD, and depression. R. 789.

Ms. Ihrig also indicated that Karen would be impaired in her ability to respond appropriately to supervision, coworkers, and work pressures, including extreme limitation in her ability to respond appropriately to changes in a work setting. Id. She stated Karen has marked limitations in her abilities to interact appropriately with the public and respond appropriately to work pressures in a usual work setting, and is moderately limited in her abilities to interact appropriately with supervisors and coworkers. Id. Ms. Ihrig described the relevant symptoms of Karen's PTSD, anxiety and panic, depression, and anorexia. Id. Ms. Ihrig also noted that she believed Karen to be impaired with memory and concentration, her ability to sit still, organization and time management, and judgment. Id. Ms. Ihrig concluded that Karen was unable to work, but had the capacity to improve and decrease symptoms of her mental conditions if she continued to consistently comply with her medication, continued with counseling, and adjusted her diet. R. 790. She last indicated that Karen would be absent from work more than two days per month. Id.

Robert Dean, M.D., completed the same questionnaire in September 2015. He also indicated that Karen was impaired in her ability to understand, remember, and carry out information, specifically checking that she had extreme impairment in performing at a consistent pace. R. 791. He found marked impairments in (1) understanding and remembering detailed instructions, (2) carrying out detailed instructions, (3) maintaining attention and concentration for extended periods, (4) completing a normal workday and workweek, and (5) performing activities within a schedule, maintaining regular attendance, and being punctual. Id. He identified moderate impairments in sustaining an ordinary routine without special supervision and making simple work-related decisions, and mild impairments in remembering locations and work-like procedures, working with or near others without being distracted by them, and carrying out short,

simple instructions. Id. Finally, he found no impairment in understanding and remembering short, simple instructions. Id. Dr. Dean determined that Karen's anxiety and pain caused those limitations. R. 792.

Dr. Dean also noted impairments in Karen's ability to respond appropriately to supervisors, coworkers, and work pressures in a working setting, indicating that she had marked impairment in her ability to respond appropriately to work pressures in a usual work setting, and moderate impairments in interacting appropriately with the public, supervisors, and coworkers, and responding appropriately to changes in a routine work setting. Id. He wrote that her irritability, anxiety, and significant pain caused those impairments. Id. He also wrote that Karen's significant pain impairs her abilities to sustain activity and work a full day. Id. Dr. Dean indicated that Karen would be absent from work more than twice per week, and that her chronic pain, depressed mood, and episodes of panic caused her to be unable to perform regular, sustained activity, manage her relationships, or carry out routines. R. 793.

In October 2015, Beverly Gray, LCSW, completed the same medical source questionnaire. She indicated that Karen has impairments in understanding, remembering, and carrying out information because of her depression and PTSD, specifically denoting extreme limitations in completing a normal workday or workweek, performing at a consistent pace, and performing activities within a schedule, maintaining regular attendance, and being punctual. R. 794. Ms. Gray found marked limitations in understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, and making simple work-related decisions. Id. She identified moderate limitations in remembering locations and work-like procedures, understanding and remembering short and simple instructions, carrying out short and simple instructions, sustaining an ordinary

routine without special supervision, and working with or near others without being distracted by them. Id. She also found marked limitation in Karen's responding appropriately to work pressures in a usual work setting, moderate limitation in responding appropriately to changes in a routine work setting, and mild limitations in interacting appropriately with the public, supervisors, and coworkers. R. 795. Finally, she checked that Karen would be absent from work more than two days per month. R. 796.

Ms. Gray submitted a letter on Karen's behalf in October 2015. She summarized that Karen receives specialized trauma therapy, presents with a variety of symptoms, and carries diagnoses of MDD (severe and recurrent without psychosis) and PTSD with dissociative symptoms. R. 849. She also appeared uncomfortable due to pain. R. 850. Ms. Gray described that Karen had two past psychiatric hospitalizations and that she takes medication, but alleged that the medication does not control Karen's symptoms. Id. Ms. Gray alleged that Karen had difficulties completing daily tasks because of her alleged DDD and fibromyalgia. Id. She concluded that Karen is unable to maintain steady employment. Id. Ms. Gray also wrote a letter in March 2016, in which she still believed Karen to be disabled due to psychological and physical issues. R. 848. Ms. Gray wrote a third letter in November 2016, in which she again insisted that Karen is disabled and deserves benefits. R. 936–37.

In November 2016, Susan Griffin, M.D., completed a clinical assessment pain form. In the multiple-choice questionnaire, Dr. Griffin indicated that Karen's pain is present and incapacitating; physical activity, such as walking, standing, and bending, increases pain to the extent that medication and/or bed rest is necessary; and medication impacts Karen's work ability to the extent that Karen is restricted from the workplace and unable to function at a productive level. R. 938.

Dr. Griffin also completed in November 2016 a medical source statement regarding Karen's physical capabilities. She indicated that Karen could lift and carry up to ten pounds occasionally, but never anything more at any frequency. R. 939. Karen could sit and walk for one hour without interruption, and walk for fifteen to twenty minutes without interruption. R. 940. In an eight-hour workday, Karen could sit, stand, and walk for three hours each. Id. For Karen's right hand, she could never reach overhead, rarely perform all other reaching, occasionally handle, finger, and feel, and never push or pull. Id. With her left hand, Karen could rarely reach in any direction, occasionally handle, finger, and feel, and never push or pull. Id. Dr. Griffin indicated that Karen could occasionally operate foot controls with both feet. R. 941. For postural activities, Dr. Griffin indicated that Karen could occasionally climb stairs and ramps, rarely balance, stoop, or kneel, and never kneel, crouch, or climb ladders or scaffolds. Id. For environmental limitations, Dr. Griffin indicated that Karen could never tolerate unprotected heights, humidity/wetness, or extreme cold or heat; rarely tolerate moving mechanical parts; occasionally tolerate operating a vehicle and vibrations; and frequently tolerate dust, odors, fumes, and pulmonary irritants. R. 942. She could handle moderate noise. Id. Regarding Karen's daily activities, Dr. Griffin indicated that Karen could shop, walk without assistive devices, use public transportation, climb a few steps with a handrail, prepare a simple meal and feed herself, care for personal hygiene, and sort/handle paper files. R. 943. She indicated that Karen could not travel without a companion for assistance, or walk a block at a reasonable pace on a rough or uneven surface. Id. Dr. Griffin estimated that the impairments had lasted or would last for at least twelve months. Id. Dr. Griffin wrote, "I feel the patient is totally and permanently disabled." Id.

Finally, Ashley Ihrig, LCSW, completed another medical source questionnaire regarding Karen's mental condition. She found impairment in Karen's ability to understand, remember,

and carry out instructions, specifically extreme limitations in carrying out short and simple instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, completing a normal workday or workweek, and performing at a consistent pace. R. 1005. She found marked limitations in remembering locations and work-like procedures, understanding and remembering detailed instructions, sustaining an ordinary routine without special supervision, and working with or near others without being distracted by them. Id. Ms. Ihrig also noted moderate limitations in understanding and remembering short and simple instructions, making simple work-related decisions, and performing activities within a schedule, maintaining regular attendance, and being punctual. Id. Ms. Ihrig included narrative comments about Karen's PTSD, depression, and related symptoms. R. 1006. She also indicated that Karen is impaired in her ability to respond appropriately to supervisors, coworkers, and work pressures, specifically that Karen has extreme impairment in responding appropriately to work pressures in a work setting. Id. She denoted that Karen has marked impairments in interacting appropriately with the public and coworkers, and responding appropriately to changes in the work setting. Id. Finally, she indicated that Karen has moderate impairment in interacting appropriately with supervisors. Id. She described that Karen has difficulty making decisions and an impaired ability to concentrate, and wrote that Karen's medication impairs her concentration, focus, and memory. Id. Ms. Ihrig indicated that Karen would be absent from work more than two days per months. R. 1007. She last explained how stress exacerbates Karen's psychological symptoms. Id.

### B.  ALJ's Consideration of His Prior Unfavorable Decision

Karen argues that the ALJ erred by according great weight to his prior unfavorable decision, dated September 4, 2013. Pl.'s Br. at 9, Dkt. No. 13. She specifically argues that the ALJ failed to recognize the voluminous additional medical evidence submitted for her new

application, including the many new medical source statements. Id. at 10. In failing to consider that evidence, the ALJ erred in assuming that Karen's medical conditions could not and did not deteriorate over time. Id. at 11. The Commissioner counters that the ALJ appropriately gave great weight to the prior RFC determination, and asserts that treatment notes do not support Karen's contention that her condition has deteriorated. Def.'s Br. at 15–16, Dkt. No. 16.

The SSA's Acquiescence Ruling (AR)[4] 00-1(4) instructs that an adjudicator "must consider . . . a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances." SSAR 00-1(4), 2000 WL 43774, at *4 (Jan. 12, 2000). In determining the weight to assign to a prior decision, the adjudicator *will* consider such factors as:

> (1) whether the fact on which the prior finding was based is subject to change with the passage of time . . . (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

Id. In sum, AR 00-1(4) holds that an ALJ must consider a prior ALJ's finding and give it appropriate weight under all the relevant facts and circumstances. Having reviewed the record as a whole, I find that substantial evidence does not support the ALJ's decision to give his prior unfavorable decision great weight.

In formulating Karen's RFC, the ALJ wrote that he "accorded great weight to the findings in the previous hearing decision of September 3, 2013, the day before the alleged onset date of the present matter." R. 22. The ALJ then recited the standard set forth in AR 00-1(4), and observed that where a "prior finding was about a fact which is subject to change with the passage

---

[4] An Acquiescence Ruling is the SSA's explanation of how it will apply a holding from a United States Court of Appeals that is at variance with its national policies for adjudicating claims. AR 00-1(4) addressed <u>Albright v. Comm'r of Soc. Sec.</u>, 174 F.3d 473 (4th Cir. 1999) (which interpreted <u>Lively v. Sec'y of Health & Human Servs.</u>, 820 F.2d 1391 (4th Cir. 1987)).

of time . . . the likelihood that such fact has changed generally increases as the interval of time between the previously adjudicated period and the period being adjudicated increases." Id. The ALJ wrote that an adjudicator "should give greater weight to such a prior finding when the previously adjudicated period is close in time to the period being adjudicated in the subsequent claim." Id. The ALJ concluded, "In determining the weight assigned to such a prior finding, an adjudicator must consider all relevant facts and circumstances on a case-by-case basis." Id. The ALJ then provided a mere one-sentence justification for assigning great weight to his prior decision: "As the hearing decision on the prior application was issued the day before the alleged onset date in the current claim, and because that decision was affirmed by the Appeals Council, greater weight should be accorded the [RFC] finding from that decision." R. 23.

The ALJ does not provide any discussion of the three factors he is required to consider. He recites the applicable standard, and appears to conclude that the prior decision gets great weight solely because it was issued right before Karen's alleged onset date in this action. While the ALJ outlined in his decision the new medical evidence submitted after he denied Karen's first claim, the ALJ fails to recognize that Karen's condition has worsened since his prior decision and did not fairly characterize the newly-submitted evidence. While an explicit discussion of each factor may not be required, the record amply demonstrates that Karen's condition has changed significantly since the ALJ's prior decision, and his failure to discuss, or even recognize, that showing frustrates meaningful judicial review. Cf. Stevens v. Colvin, No. 6:14–cv–00021, 2015 WL 5510928, at *18 (W.D. Va. Sept. 16, 2015) (affirming ALJ's consideration of a prior decision when ALJ concluded that the record "did not document significant changes in the claimant's medical condition since that decision"; even though the ALJ did not specifically address whether the facts that formed the basis for the denial of the

claimant's first claim were subject to change with the passage of time, or the likelihood of such change, he did not err because the record did not demonstrate such a change).

The ALJ's prior RFC determination[5] is very similar to his current RFC finding.[6] The ALJ found that Karen was capable of performing sedentary work and lifting twenty pounds occasionally and ten pounds frequently. R. 74. The prior RFC requires that Karen be allowed to change postural positions every thirty minutes. Id. She could occasionally kneel, crawl, crouch, stoop, balance, and climb, and would avoid concentrated exposure to moving or hazardous machinery and unprotected heights. Id. Karen would have been off task up to ten percent of the workday and would be absent up to once per month due to mental impairments and pain. Id. Finally, she must have worked in a low-stress job, defined as requiring only occasional decision-making and changes in work setting, with only occasional interaction with the public or coworkers. Id.

The ALJ found identical exertional and postural limitations, except in the present RFC, Karen would have to be able to change positions at will instead of every thirty minutes. The ALJ added some additional environmental limitations here. Significantly, the ALJ found a more restrictive mental RFC in his prior decision, as he wrote that Karen would be absent one day per month because of her conditions but did not make that finding here. The fact that the RFCs are almost identical demonstrates that the ALJ did not consider that the record evidence

---

[5] In his prior decision, the ALJ found the severe impairments of cervical spondylosis without myelopathy, cervical DDD, cervical radiculopathy, lumbar DDD and spondylosis, hypertension, cardiomyopathy, dyspnea, PTSD, and anxiety. R. 72. He also found "major dap," but it is unclear to me what that refers to.

[6] For ease of reference, the ALJ's RFC finding in this decision is that Karen is capable of performing sedentary work; can lift and carry twenty pounds occasionally and ten pounds frequently; sit for six hours in an eight-hour day; stand and/or walk for two hours in an eight-hour day; needs to be able to alternate sitting or standing at will; is unable to climb ladders, ropes, or scaffolds, but can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; must avoid concentrated exposure to excessive vibration, operational control of moving machinery, unprotected heights, or hazardous machinery; is limited to work in a low-stress job (defined as having only occasional decision-making or changes in the work setting) with only occasional interaction with the public or coworkers; and would be distracted from work activities not more than ten percent of a normal workday. R. 16–17.

demonstrates that Karen's condition has deteriorated since the prior decision.

Any argument asserting that the objective medical evidence remained the same since the ALJ's prior decision is unavailing. In his prior decision, the ALJ reviewed the medical evidence of record at that time, and many of his conclusions conflict with the medical evidence here.

- In his prior decision, the ALJ wrote that Karen "rarely complained" of gastrointestinal symptoms after 2011. R. 75. He later concluded that Karen received "little ongoing treatment" for her IBS. R. 78. In contrast, Karen saw specialists in 2014, 2015, and 2016, and testing resulted in a Crohn's disease diagnosis in 2016.

- In the prior case, MRIs from 2012 showed mild cervical spine bulges at multiple levels, and a May 2013 MRI showed cervical spine disc space narrowing and degeneration; consequently, the ALJ concluded that Karen had "mostly mild" DDD. R. 76–77, 79. Here, however, later imaging studies showed *moderately severe* narrowing of the C5-C6 disc space with edema in the disc and endplates, a small posterior disc herniation with no significant spinal or foraminal stenosis, a small herniated disc at C4-C5 with mild narrowing of foramina, and *severe* narrowing of the C6-C7 disc space but no significant spinal or foraminal stenosis. Two years later, another MRI revealed multilevel cervical DDD with *severe narrowing* at C4-C5, C5-C6, and C6-C7; *moderate narrowing* of foramina bilaterally at C4-C5; and mild to moderate narrowing of the right foramen at C5-C6.[7]

- The ALJ concluded previously that conservative medication, including over-the-counter pain relievers, helped Karen's pain, and that objective testing did not bolster

---

[7] Furthermore, in his overview of the medical record in this decision, the ALJ omitted key evidence that contradicted his conclusions. For example, the ALJ discussed only the May 2013 cervical spine imaging studies, and failed to discuss the studies from 2015, which showed that, in two years, Karen's condition worsened. See R. 779. This omission is important when the ALJ later commented that the radiological findings here "are not particularly compelling." R. 21.

her previous complaints of pain. R. 79. Here, Karen began seeing a rheumatologist in late 2013 and 2014, who wrote that she definitely had fibromyalgia and that Karen "still has sig[nificant] pain but the treatment options are limited." R. 337.

- For her mental impairments, the ALJ previously concluded that Karen took "routine psychiatric medications" and had "occasionally gone to counseling," and specifically noted that Karen had never sought or been recommended for inpatient treatment. The ALJ also wrote that Karen "consistently denied severe symptoms" associated with depression and anxiety, and her "routine psychiatric medications" were prescribed by general practitioners. R. 79–80. In stark contrast, the new records show that Karen was attending weekly counseling from September 2013 through December 2015 with Ms. Ihrig, and additional specialized therapy with Ms. Gray later on. Karen also had two extended psychiatric inpatient hospital stays in the present relevant period. Finally, she continued seeing her treating psychiatric providers at St. Albans after her hospitalizations, who managed her psychiatric medications (as opposed to other "general practitioners").

It is crucial that the ALJ's justifications for finding Karen not disabled in his previous decision are present in the objective evidence of record. For example, the ALJ originally noted that Karen had rarely sought treatment for gastrointestinal problems (but now Karen sees specialists and received a positive Crohn's diagnosis). He previously emphasized that objective evidence did not support Karen's pain allegations (but now imaging studies show her DDD has worsened and she even has a rheumatologist for pain). The ALJ previously stated that Karen had only occasional counseling and no hospitalizations (but had weekly counseling during this relevant period and was hospitalized twice). Finally, the ALJ wrote that Karen's psychotropic

medication was routine and provided by general practitioners (but now psychiatrists manage Karen and her many psychiatric medications). Even in light of the new record, the ALJ did not modify his RFC or explain how he considered the changes in evidence.

The record evidence demonstrates that Karen's gastrointestinal problems became much more significant, her DDD worsened, and her mental health conditions declined such that she was hospitalized on two occasions for suicidal thoughts and required much more than "occasional" counseling. The ALJ's simple conclusion that his prior decision deserves great weight because it was closely related in time to the present alleged onset date does not explain how the ALJ considered Karen's deteriorating condition. Accordingly, because the ALJ's "characterization of the medical record generated after [his first] decision ignores several pieces of additional, material evidence, his decision to give [his prior] decision [great] weight [is] in error." Farrar v. Astrue, Civil No. 3:11cv457–JAG, 2012 WL 3113159, at *10 (E.D. Va. July 13, 2012).

The ALJ's review and discussion of the medical evidence may, on its own and without the prior decision, meet the low evidentiary threshold of substantial evidence review. However, the ALJ qualifies his entire analysis here and states, "In reaching these conclusions concerning [Karen's RFC], the undersigned has accorded great weight to the findings in the previous hearing decision." R. 22. Even though the ALJ cites AR 00-1(4), he fails to properly apply it because he relies solely on his prior decision's proximity in time to Karen's present alleged onset date. The Court is thus "left to guess" as to how the ALJ incorporated the deterioration in Karen's condition since his prior decision. See Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015).

## **CONCLUSION**

For the foregoing reasons, I **RECOMMEND GRANTING in part** Karen's motion for

summary judgment, **DENYING** the Commissioner's motion for summary judgment, and **REMANDING** this case for further consideration by the ALJ. [8]

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, Chief United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive on the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including the waiver of the right to appeal.

Entered: August 26, 2019

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge

---

[8] Because I find that remand is warranted based on the ALJ's failure to properly evaluate his prior decision, I will not address Karen's additional allegations of error. See Boone v. Barnhart, 353 F.3d 203, 211 n.19 (3d Cir. 2003) (remanding on other grounds and declining to address claimant's additional arguments).